IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN G. WATTS, :
    *Petitioner*, :
    v. : CIVIL ACTION
: NO. 15-3740
LAWRENCE MAHALLY, et al., :
    *Respondents*. :

**Jones, II     J.**                                                                                    **March 27, 2017**

### **MEMORANDUM**

Petitioner John G. Watts seeks *habeas* relief, alleging violations of his constitutional rights in the course of a state trial that ended in a prison sentence of 24.5 to fifty years and two months for convictions stemming from a $100 robbery. After careful consideration of the state court record, this Court finds that the trial judge's decision to instruct the jury with an obviously irrelevant, inadmissible and highly prejudicial fact *dehors* the record, over defense counsel's objection and in deprecation of his proper closing argument, deprived Petitioner of his Sixth Amendment right to a fair trial and effective assistance of counsel. Because the trial court's error is *per se* prejudicial under clearly established federal law and, in any event, had a substantial and injurious effect or influence on the jury's verdict, this Court grants the writ of *habeas corpus* and directs the Commonwealth to release Petitioner from custody unless the state court holds a new trial within the next six months.

### **RELEVANT BACKGROUND**

According to the state court record, Watts and his alleged co-conspirator, Dontay Hughes, robbed Nicholas Harris of $100 at a train station in the Germantown section of Philadelphia around 4:15 p.m. on July 28, 2007. Harris testified the robbery involved two separate encounters. The first time Watts and Hughes approached Harris, Watts demanded $20,

1

took Harris' cell phone and made a phone call.  Harris asked whether he would be left alone if he complied, and Watts responded "yes."  Harris gave Watts $20 and Watts returned the cell phone.  The assailants left to a different area of the station.  N.T. 11/13/08 at 38:1-40:3.

A few minutes passed.  Watts and Hughes approached Harris again, each placing a hand on one of Harris' shoulders.  Watts demanded the rest of Harris' belongings, and Harris complied by turning over his wallet.  Watts took the remaining $80 and returned the wallet.  Initially, Harris claimed Watts and Hughes left after taking the money.  Harris went home without further incident and called the police.  He said nothing about a gun or any threats of harm.  *Id*. at 42:22-44:2.  However, after the prosecutor asked Harris whether the assailants were armed, Harris testified he saw a bulge on Hughes' hip, which he believed was a handgun.  And, after the prosecutor asked if the assailants had said anything about a gun, Harris testified that Hughes claimed to have a "burner" on the side of his hip and threatened to shoot him "in front of everybody" if he made a scene.  *Id*. at 44:2-51:6.  On cross-examination, Harris confirmed bystanders had witnessed the incident without fleeing.  *Id*. at 77:9-78:15.  He also admitted he never saw a firearm.  *Id*. at 82:25-84:2.

Two police officers responded to Harris' call and, with his assistance in the police vehicle, they located the alleged perpetrators about two blocks from the scene of the incident.  Upon seeing Harris in the back of the police car, Watts and Hughes fled in separate directions.  *Id*. at 56:12-61:4.  The officer pursued Watts who entered an abandoned building and jumped out of a second story window.  After a brief struggle, the officer subdued Watts and transported him to a hospital and then to the local police station for arraignment.  *Commonwealth v. Watts*, 619 EDA 2009, slip op. at 2-3 (Pa. Super. Ct. Apr. 21, 2010).  Hughes was purportedly apprehended at a later date.  No handgun was ever recovered from either assailant.  *See id*. at 21.

Once in custody, Watts called Harris' cell phone. Harris recognized Watt's voice. He identified himself as "the boy that robbed you," and twice said, "[Y]oung boy, you don't want to do this." N.T. 11/13/08 at 65:6-66:12. Watts changed his tone and added, "I can get your money back, but, actually, from the bottom of my heart, please don't do this, I got ten years back time." *Id*. at 66:18-22. According to phone records, Watts tried to call Harris two more times from county prison but the calls failed. *Watts*, 619 EDA 2009, at 2-3.

Watts was charged with first-degree robbery, criminal conspiracy, terroristic threats, intimidating a witness, criminal use of a communication facility, carrying a firearm without a license and possession of an instrument of crime. The district attorney offered Watts a negotiated plea, including a recommended sentence of seven to twenty years, but Watts rejected it and proceeded to trial. *See Commonwealth v. Watts*, No. 3157 EDA 2013, 2015 WL 7454021, at *1 (Pa. Super. Ct. Mar. 4, 2015).

The Honorable Chris R. Wogan of Philadelphia's Court of Common Pleas presided over the jury trial. During closing argument, defense counsel focused on whether the prosecution could establish beyond a reasonable doubt that Watts "threaten[ed] to cause serious bodily injury" as required for first-degree robbery since there had been no actual bodily injury in this case.[1] N.T. 11/14/08 at 37:13-25. Defense counsel questioned Harris' credibility and reminded the jury that Harris' testimony had a "tremendous inconsistency" insofar as he had said "nothing" about the "bulge" until after the prosecutor "rehabilite[d] . . . or prompt[ed]" him, as if that recollection was merely an "afterthought." *Id*. at 38:12-39:5. Defense counsel argued: "This is what reasonable doubt consists of; inconsistencies in the testimony of the witnesses."

---

[1] Robbery in the first degree occurs when "in the course of committing a theft," a person "(i) inflicts serious bodily injury upon another; (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; or (iii) commits or threatens immediately to commit any felony of the first or second degree." 18 Pa. Stat. and Cons. Stat. Ann. § 3701(a)(1)(i)-(iii), (b)(1) (West).

*Id*. at 39:1-4.  Counsel pointed out that none of the bystanders appeared in court to corroborate Harris' testimony, and that Harris' own recollection suggested they had not been frightened by the incident.  *Id*. at 39:16-40:20.  He argued, "What does that tell you as to what was going on? That, basically, again, is a reasonable doubt as to whether there was even a bulge or there was even anything said about the shooting, because those people would have moved away."  *Id*. at 40:15-20.  Counsel then questioned whether Harris had ever felt "threatened" since he did not call the police until after calling his brother and going home first.  He argued, "If you were just threatened, you would be calling the police there . . . but [Harris] doesn't act like you would think a reasonable victim or complainant would."  *Id*. at 41:2-12.  Lastly, counsel emphasized that there "was never any gun found *in this case*; none, none, none."  *Id*. at 46:6-7 (emphasis added).  He argued, "Don't you think if they would have found a gun from Dante Hughes [*sic*] . . . that the gun would have been here today?"  *Id*. at 45:19-46:3.  He contended this was "another reason to believe that there is no gun *in this case*; that a bulge is a bulge."  *Id*. at 46:7-9 (emphasis added).

        At sidebar, the prosecutor complained that defense counsel had "made a big deal about the fact that no gun was recovered from Dante Hughes [*sic*]."  *Id*. at 54:25-55:10.  The prosecutor claimed that statement "[was] not true" because a .22 caliber rifle had been recovered from Hughes pursuant to his arrest for a "*second robbery where a riffle was used*."  *Id*.  The prosecutor believed she should be allowed to disclose that information to the jury during her summation although she had chosen not to introduce the rifle into evidence.  *Id*. at 55:12-23.  Neither defense counsel nor the court was aware of the alleged rifle.  *Id*. at 55:24-56:10.

        Instead of overruling the prosecutor's objection, Judge Wogan offered to instruct the jury as to the existence of the rifle in an attempt to "keep this as neutral as possible."  *Id*. at

56:12. Defense counsel objected, "That is going to be extremely prejudicial. There is a bulge." *Id*. at 56:18-19. The court disagreed, "I don't think it hurts your client, but we can't leave [the jury] with an impression that is not true." *Id*. at 56:22-24. Defense counsel argued his statement was true insofar "as the evidence that came in" did not include any reference to a rifle. *Id*. at 56:25-57:2. Judge Wogan acknowledged as much: "It doesn't sound like a rifle was used by Dante Hughes [*sic*] in this courtroom *committing this crime*." *Id*. at 58:20-22 (emphasis added). Nevertheless, believing "no one [was] going to think a rifle was used in this crime," he overruled defense counsel's objection and instructed the jury as follows:

> Ladies and gentlemen, you remember what I told you, that closings and even questions by attorneys may be helpful guides, but they don't constitute evidence.
>
> In this case – I should say in this situation, the co-defendant, Dante Hughes [*sic*], there was no handgun recovered from Dante Hughes, that is determined that way and that is correct. *There was, however, a rifle that was recovered from Dante Hughes. Dante Hughes is not on trial here, but you heard him mentioned as a co-defendant in this case. So I think I have an obligation to make sure that you know that there are no misimpressions left with you. And no one consciously is misleading you. These things happen during trials.*

*Id*. at 59:4-61:23 (emphasis added). Defense counsel was not afforded the opportunity to comment on the instruction. *Id*. at 60:22-61:6. After the prosecution's closing argument, defense counsel moved for a mistrial due to the rifle instruction, but Judge Wogan denied the motion. *Id*. at 85:21-23. Defense counsel also moved for a charge of second-degree robbery,[2] but that motion was denied as well. *Id*. at 115:21-116:8. The jury convicted Watts of all charges

---

[2] Robbery in the second degree occurs when "in the course of committing a theft," a person "inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury." 18 Pa. Stat. and Cons. Stat. Ann. § 3701(a)(1)(iv), (b)(1) (West).

5

except carrying a firearm without a license and possession of an instrument of crime. *Id*. at 120:10-121:15.

On January 20, 2009, Judge Wogan sentenced Watts to 24.5 years to fifty years and two months in prison. N.T. Sentencing Hr'g 1/20/09 at 49:10-11. In computing the sentence for the robbery and criminal conspiracy, the court added a deadly weapon enhancement. *Id*. at 44:4-6; 45:4-6. The court reasoned that the enhancement applied in cases where a defendant was in close proximity to a co-conspirator carrying a gun. *Id*. at 23:4-10. And, even though there was never a finding that either of the alleged perpetrators possessed a gun during the robbery, the court deduced "there was a gun used in this case" because "there was a bulge." *Id*. at 29:6-10. Furthermore, the court found it relevant that Watts had been "convicted of a robbery with fear of serious bodily injury," even though he had been acquitted of the firearm charges. *Id*. at 23:17-21. The weapon enhancement did not impact the sentence for robbery. Because this robbery was a second strike against Watts, the second strike rule mandated a minimum of ten to twenty years, far above the guideline range for the robbery even with a weapon enhancement. *Id*. at 44:2-17. The second strike rule <u>did not</u> apply to the other convictions. Thus, the weapon enhancement affected the sentence for criminal conspiracy, putting the guidelines range at forty-five to fifty-seven months (3.75 to 4.75 years), plus or minus twelve months, due to Watts' offense gravity score of nine and prior record score of four. *Id*. at 45:3-8. Judge Wogan imposed a "slightly" aggravated sentence of sixty-six to 132 months (or 5.5 to eleven years) for criminal conspiracy, because of Watts' prior juvenile offenses. *Id*. at 45:8-22. Although the mandatory minimum was ten to twenty years, Judge Wogan ultimately sentenced Watts to more than double that time based on the attendant convictions. *Id*. at 45:23-46:23.

Watts appealed from the judgment. He filed a 1925(b) statement listing several errors to be raised, including the following:

> 1) The trial court erred in telling the jury after the evidence in the case was closed and after the defense counsel closing argument, that a rifle was recovered from Dontay Hughes, who was a co-defendant of the defendant who was not on trial. There was no allegation or evidence that a rifle was used in this case. Also evidence is to come from witnesses not the trial court. The trial court also erred in not allowing defense counsel to comment upon this evidence that the trial court stated to the jury and further erred by not granting the defense motion for mistrial. The trial court denied the defendant his State and Federal Constitutional Rights to confront the witnesses and evidence against him.
>
> 2) The trial court erred in applying the deadly weapon enhancement provision of the sentence guidelines because the defendant was acquitted of all weapons charges in the case and the evidence in the case did not show beyond a reasonable doubt that a deadly weapon was used during the incident.

Def's 1925(b) Direct App. Statement at pp. 1-2 (Apr. 6, 2009).

In an opinion, filed August 12, 2009, Judge Wogan addressed these claims. With respect to the rifle instruction, he found no harm because Petitioner had been acquitted of the firearm charges. *Commonwealth v. Watts*, CP-51-CR-9464-2007, CP-51-CR-10470-2007, slip op. at 11 (Ct. Comm. Pl. Aug. 12, 2009). He explained, "[T]his *correction* did not harm defendant nor deprive him of a fair trial, but simply *corrected defense counsel's misstatement of facts* pertaining to a codefendant." *Id*. (emphasis added). In determining the weapon enhancement applied, Judge Wogan added, "[T]hese guidelines were proper where defendant was in close proximity to the codefendant, whom *the jury believed* to be carrying a firearm, since they found defendant guilty of conspiracy and first degree felony robbery." *Id*. at 14 (emphasis added).

On direct review, the Superior Court of Pennsylvania affirmed the judgment. *Watts*, 619 EDA 2009, slip op. at 1. In the court's opinion, the trial judge abused his discretion when he offered the "cautionary instruction," rather than overrule the prosecutor's objection. *Id*. at 22. The court noted it was "clear that defense counsel was referring to the firearm purported to have been responsible for the bulge in Hughes [*sic*] clothing, the presence of which was a disputed fact at trial." *Id*. at 21-22. The court nevertheless concluded the error was "harmless beyond a reasonable doubt" under *Commonwealth v. Wood*, 637 A.2d 1335, 1351 (Pa. Super. 1994), because Watts had been acquitted of the firearm charges and the robbery and conspiracy convictions were not "dependent upon the actual presence of a firearm." *Id*. at 22-23. It also affirmed the weapon enhancement because the trial court could have independently found, under a "preponderance of the evidence" standard at sentencing, that a weapon had been used. *Id*. 28-29. Watts appealed the Superior Court's decision, but Pennsylvania's Supreme Court denied the appeal. *Commonwealth v. Watts*, 17 A.3d 1254 (Pa. 2011). He sought post-conviction relief on other grounds, but his efforts failed. *See Watts*, 2015 WL 7454021, at *1.

On July 5, 2016, after the conclusion of the state court proceedings, Watts timely filed a *pro se habeas* petition pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). He raised four claims: (1) the trial court violated his constitutional due process rights when it rejected his request to charge the jury on the lesser-included offense of second-degree robbery; (2) the trial court erred when it applied the deadly weapon enhancement without making an independent factual finding under the proper standard or submitting the question to the jury; (3) the trial court erred when it instructed the jury that an unrelated rifle had been recovered from his alleged co-conspirator; and (4) the trial court committed cumulative error. Pet. 10-25, ECF No. 1. This Court referred the petition to the

Honorable Richard Lloret, U.S. Magistrate Judge, for a report and recommendation ("R&R"). Judge Lloret recommended the petition be denied and dismissed with prejudice. R&R 16, ECF No. 11. Petitioner timely objected to the R&R. ECF. No. 13.

On *de novo* review, this Court adopted the R&R with respect to Claims I and IV, but granted a hearing with regards to Claims II and III. ECF No. 16. Because Petitioner had been acting *pro se* and these issues presented difficult questions of law, this Court appointed counsel for Petitioner. Counsel filed supplementary briefs and a hearing was held on March 1, 2017. Petitioner attended via videoconference.

## STANDARD OF REVIEW

Under the AEDPA, *habeas* relief is proper only if the state court's adjudication of the claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

When a state court has found harmless error, a "federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Johnson v. Lamas*, __ F.3d __, 2017 WL 835180, at *10 (3d Cir. Mar. 3, 2017) (citing to *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007))) (emphasis in original). To be unreasonable, the state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

**DISCUSSION**

None of the reviewing courts disagree the trial judge erred when instructing the jury as to the existence of the rifle. However, because the jury acquitted Petitioner of the firearm charges, the courts below were satisfied the error was harmless. This Court respectfully differs and finds the trial court's erroneous instruction was *per se* prejudicial and the Superior Court's harmlessness determination was unreasonable and contrary to clearly established federal law.

In the context of *habeas* review, the U.S. Supreme Court has placed constitutional errors on two ends of a spectrum. *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). On one end, there are "errors of the trial type" that are "amenable to harmless-error analysis" because they may "be quantitatively assessed in the context of other evidence presented in order to determine" their effect on the trial. *Id*. In those cases, the conviction is reversible only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)). On the other end, there are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id*. at 629 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309 (1991)). "The existence of such defects . . . requires automatic reversal of the conviction because they infect the entire trial process." *Id*. at 629-30 (citing to *Fulminante,* 499 U.S. at 309-10). The Third Circuit considers structural errors to be "per se prejudicial," *Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998), and "*per se* reversible even in habeas cases," *Palmer v. Hendricks*, 592 F.3d 386, 397 n.6 (3d Cir. 2010) (citing to *Brecht*, 507 U.S. at 629-30).

Although the Supreme Court has not squarely addressed the precise situation presented in this case, relevant principles are readily discernible in its jurisprudence. *See White v. Coplan*, 399 F.3d 18, 25 (1st Cir. 2005) ("There is no Supreme Court case directly on all fours,

10

but AEDPA requires no such thing."). The Sixth Amendment guarantees a jury verdict based solely on evidence presented at trial "from the witness stand in a public courtroom where there is *full judicial protection* of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (emphasis added). Where a trial judge "assume[s] the role of a witness" and instructs the jury with extraneous evidence in repudiation of the defendant's testimony, the Court "cannot doubt" the error "was highly prejudicial." *Quercia v. United States*, 289 U.S. 466, 470-72 (1933). Likewise, when an erroneous jury instruction deprives a defendant of the right to a verdict of guilt beyond a reasonable doubt, it is *per se* prejudicial because it "vitiates *all* the jury's findings" and its effects "are necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993) (emphasis in original); *see also Bihn v. United States*, 328 U.S. 633, 637 (1946) (jury instruction shifting the burden of proof onto defendant was prejudicial error, even though there was uncertainty as to actual harm, because "the probabilities of confusion in the minds of the jurors seem[ed] so great, and the charge was so important to the vital issue in the case").

This "per se rule of prejudice" exists in other "Sixth Amendment contexts," such as "various kinds of state interference with counsel's assistance." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). In those situations, harm "is so likely that case-by-case inquiry into prejudice is not worth the cost." *Id*. Judicial interference with defense counsel's summation is especially troubling, because "closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *See Herring v. New York*, 422 U.S. 853, 862 (1975) (total denial of opportunity to make closing argument was *per se* reversible). The Seventh Circuit's decision in *United States v. Spears*, 558 F.2d 1296 (7th Cir. 1977), is highly instructive. There, the trial judge interrupted defense counsel's closing

11

argument and criticized him in front of the jury for making an improper and purportedly false statement, which, as it turned out, was "basically correct." 558 F.2d at 1297. The court of appeals found the trial judge's disparaging remarks "made a fair consideration of the case by the jury most difficult, if not impossible." *Id*. The judge's interjection also "seriously prejudiced the defense" because it "went far beyond the correction of an alleged misstatement" and, instead, had the effect of undermining counsel's ability to be an effective advocate for the defendant. *Id.* at 1298.

Similarly, Petitioner argues that Judge Wogan's erroneous instruction was *per se* prejudicial because it undermined his right to effective assistance of counsel and made a fair consideration of his case by the jury improbable. Hr'g 03/01/17. This Court agrees. Petitioner's trial was irreversibly compromised after the trial judge not only offered the jury an irrelevant and highly prejudicial fact from outside the record after close of evidence and in contradiction of defense counsel's proper characterization of the evidence, *see Quercia*, 289 U.S. at 470 (a trial judge "may analyze and dissect the evidence, but he may not either distort it or add to it."), but also, inadvertently or willfully, undermined defense counsel's credibility by incorrectly insinuating that he had "consciously" misled (in effect, lied to) the jury without giving him any opportunity to rectify his statement, *see Spears*, 558 F.2d at 1298 ("the devastating impact of the judge's gratuitous remark is readily apparent."). An error of this magnitude is properly understood as *per se* prejudicial because the effect on everything that happened after the erroneous instruction is "necessarily unquantifiable and indeterminate." *Sullivan*, 508 U.S. at 281-82. There is simply no way to get into the jurors' minds to ascertain the erroneous instruction's full sting.

Even so, this is not a case in which the prejudicial effect is merely theoretical. The rifle instruction was not a happenstance mistake that could be subsumed into everything else that happened at trial, but instead proved to be "important to the vital issue in the case," *Bihn*, 328 U.S. at 637, i.e., whether the jury could find *beyond a reasonable doubt* that Petitioner or his alleged co-conspirator was armed or put the victim in fear of serious bodily injury. Prior to the rifle instruction, the only evidence the jury had for making that determination was the victim's uncorroborated testimony about the bulge and "burner" threat. If the jury had disbelieved that part of the victim's testimony – which had been put into question by the victim's arguably diverging accounts of the incident – the jury would have had to acquit Petitioner of first-degree robbery and criminal conspiracy <u>unless</u> there was something else that would suggest the victim's testimony was credible. Enter the trial judge, who "assum[ing] the role of a witness," *Quercia*, 289 U.S. at 471, averred that a rifle had been recovered from Petitioner's alleged co-conspirator without even clarifying that it had been recovered pursuant to a subsequent, unrelated arrest. To hear the trial judge declare, as a matter of fact, that Petitioner's alleged co-conspirator was someone who possessed at least one firearm certainly weighed in favor of the victim's testimony as to the bulge and "burner" threat. *See id.*, 289 U.S. at 470 ("The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling.") (quoting *Starr v. United States*, 153 U.S. 614, 626 (1894)) (internal quotation marks omitted). The trial judge's declaration opened the door to all sorts of inferences about the alleged co-conspirator's propensity to be armed and the nature and character of the threat he posed, as well as Petitioner's criminality based upon the company he kept. Those inferences alone could have accounted for the first-degree robbery and conspiracy convictions, and could have also influenced the intimidation and terroristic threat convictions,

even without factoring in the defamatory impact of hearing that the instruction was being offered to correct a "misrepresentation" in the defense's version of events and to ensure "no one consciously is misleading you." N.T. 11/14/08 at 59:4-61:23. When considered in light of the record as a whole, the trial judge's erroneous instruction "made a fair consideration of the case by the jury most difficult, if not impossible." *Spears*, 558 F.2d at 1297; s*ee also Quercia*, 289 U.S. at 470 (trial judge's opinion that defendant had lied "was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence.").

Judge Wogan's contemporaneous statements offer strong evidence of the error's prejudicial effect on the jury's verdict and the subsequent proceedings. At sentencing, Judge Wogan imposed a deadly weapon enhancement on the understanding that "the jury believed" a firearm had been used in this case "since they found defendant guilty of conspiracy and first degree felony robbery," *Watts*, CP-51-CR-9464-2007, CP-51-CR-10470-2007, at 14, as if the existence of a firearm necessarily followed from those convictions, or more damaging yet, as if the existence of a firearm made those convictions more probable. The record does not shed any additional light as to how Judge Wogan came to his conclusion about what "the jury believed." Regardless, Judge Wogan's twisted logic exemplifies the likelihood of confusion that could ensue from introducing extraneous evidence of an unrelated firearm in this case. If the learned trial judge believed the robbery and conspiracy convictions were causally linked to the existence of a firearm, then who is to say the jury was not similarly confused as to the implications of the rifle instruction? *Cf. Bihn*, 328 U.S. at 637 ("We assume that the charge might not be misleading or confusing to lawyers. But the probabilities of confusion to a jury are so likely that we conclude that the charge was prejudicially erroneous.") (internal citation omitted). Furthermore,

Judge Wogan's decision to apply the weapon enhancement based on his understanding of the jury's beliefs underscores how the rifle instruction was more than "simply an error of the trial type" and instead was a "structural defect affecting the framework within which the trial proceed[ed]." *Fulminante*, 499 U.S. at 310.[3]

The Honorable Superior Court did not engage in this structural analysis even though it was Petitioner's only argument on direct appeal and the facts of this case cried out for application of this clearly established standard. With regards to the erroneous instruction, Watts' state appellate brief cited only to *Commonwealth v. Johnson*, a case that involved "a complete, if temporary, denial of counsel by the trial court during reiterative jury instructions, a critical stage of appellant's trial." 828 A.2d 1009, 1015 (Pa. 2003). In that case, the Supreme Court of Pennsylvania declined to adopt the harmless-error standard and concluded the error was presumptively prejudicial and warranted a new trial. *Id*. at 15-16 (citing to *Geders v. United States,* 425 U.S. 80 (1976) (finding *per se* violation of right to counsel)*,* and quoting *Brecht,* 507 U.S. at 629–30 ("The existence of such defects-deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process.")). The Superior Court's opinion does not address *Johnson*, a noticeable omission since the court seemed to understand the gravity of the trial judge's mistake: "Far from correcting a misrepresentation, the trial court injected into the case an extraneous, unproven and irrelevant fact that had the potential to confuse the jury and undermine the defense counsel's closing argument relative to the absence of a weapon **in this case**." *Watts*, 619 EDA 2009, slip op. at 22

---

[3] Even if the erroneous instruction is not a structural defect, the trial court's error also falls squarely within the "deliberate and especially egregious error of the trial type" that, as contemplated by the Supreme Court, "might so infect the integrity of the proceeding as to warrant the grant of habeas relief, *even if it did not substantially influence the jury's verdict*." *Brecht*, 507 U.S. at 638 n. 9 (citing to *Greer v. Miller,* 483 U.S. 756, 769 (1987) (Stevens, J., concurring in judgment)) (emphasis added). The conviction is *per se* reversible under this standard for the same reasons set forth in this Court's structural analysis.

(emphasis in original). These considerations, along with Petitioner's citation to *Johnson*, should have alerted the court to the possibility of finding prejudice *per se*, but it proceeded instead directly to a harmless-error analysis at the Commonwealth's invitation. *Id*. at 23. Disregarding Petitioner's only argument was unreasonable and resulted in a decision that contradicts clearly established federal law.

But even if the harmless-error standard applies, as Respondents insist, the harmlessness analysis in this case requires a divining beyond the level undertaken by the Superior Court. While it is true that the first-degree robbery and conspiracy convictions could be legally sustained without a firearm, the proper question is whether exposing the jury to a judicially-endorsed extraneous fact about an unrelated rifle, in direct contradiction of defense counsel's closing argument, tipped the scale in favor of the convictions. The court did not consider that distinction. Moreover, the prosecution's case for first-degree robbery and criminal conspiracy was not as "clear, direct, and uncontradicted" as the Superior Court's opinion suggests, but instead was based solely on the victim's uncorroborated and arguably inconsistent testimony. That the jury acquitted Petitioner of the firearm charges only accentuates the tenuousness of the prosecution's case. Lastly, the court did not factor in the trial judge's contemporaneous understanding of what the jury supposedly believed, or the cumulative and detrimental effect of the trial judge's disapproval of defense counsel's closing argument, which effectively instructed the jury that defense counsel lied to them (an indirect accusation that he was not permitted to refute), on bolstering the victim's testimony. Had the court delved a little deeper into the record and connected all the dots, it would have discerned the error's harm. Failure to do so was unreasonable. *Gregg v. Rockview*, 596 F. App'x 72, 78 n.5 (3d Cir. 2015)

(failure to consider relevant facts contributed to unreasonable application of federal law under AEDPA).

Respondents argue retrospectively that "the strength of the prosecution's case relative to Watts's defense," in combination with the firearm acquittals, sufficiently shows the jury verdict would not have been different "but for the judge's fleeting reference to Hughes's possession of a rifle." Resps.' Suppl. Br. 23, ECF No. 23. Respondents believe the trial judge inoculated the jury against any prejudicial inferences by couching the rifle instruction with sufficient disclaimers. *See, e.g., id*. at 12 and n.6. Judicial antidotes may be effective in cases where a witness or counsel offers unfairly prejudicial statements, but their curative effect diminishes when the misinformation comes straight from the bench. *See Quercia*, 289 U.S. at 472 ("Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury"). Indeed, none of the harmless-error cases cited by Respondents involve judicial derogation of defense counsel's closing argument or usurpation of the jury's fact-finding role, much less a combination of the two.[4] In any event, Judge Wogan's qualifications, such as confirming "there was no handgun recovered from Dante Hughes," did little if anything to erase the existence of the rifle from the jurors' minds. He should have never introduced that information to begin with and, at the very least, he should have withdrawn it, which he did not. *See id.* (finding the trial judge's interference had been "highly prejudicial," and observing that "[h]is definite and concrete assertion of fact, which he had made with all the persuasiveness of judicial utterance . . . was not withdrawn.").

In the end, Respondents urge affirmance of the Superior Court's decision unless this Court "is in *grave doubt* about whether or not that error is harmless." *O'Neal v. McAninch*,

---

[4] Respondents cite to *United States v. Morosco*, but that case dealt with a trial judge's inadvertent disclosure of the co-defendant's plea to potential jurors "*before* the seven-day trial began," and "well before jury deliberations," and therefore does not reach the concerns raised in this case. 822 F.3d 1, 14, 16 (1st Cir.) (emphasis in original).

513 U.S. 432, 435 (1995) (emphasis in original). This argument collapses under its own weight. *O'Neal*, like this case, involved "possible jury 'confusion' arising out of a trial court instruction." *Id*. The district court found constitutional error and granted *habeas* relief. The court of appeals reversed because it found the error was harmless. The Supreme Court granted certiorari because it appeared as though the court of appeals had put the burden of establishing prejudice on the *habeas* petitioner, which could have meant the petitioner had lost, "not because the judges concluded that the error *was* harmless, but because the record of the trial left them in grave doubt about the effect of the error." *Id*. at 436 (emphasis in original). "Grave doubt" exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435. In that situation, the Supreme Court counseled "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict" in a substantial and injurious way. *Id*. at 435.

The Supreme Court's advice notwithstanding, this Court is not merely in "grave doubt" as to the error's harmlessness in this case, but actually has *no doubt* the erroneous instruction had, at the very least, a "substantial and injurious effect or influence in determining the jury's verdict." *Id*. (citing to *Brecht*, 507 U.S. at 623). Not often does this Court encounter a more devastatingly prejudicial error than the one presented in this case; an error that lies beneath a prison sentence of 24.5 to fifty years and two months for convictions stemming from a $100 robbery. To be clear, this Court does not condone Petitioner's prior conduct, nor does it disregard the seriousness of the allegations against him. But "[n]o matter how compelling the evidence of guilt, there is a point at which unfairness in the trial requires reversal." *Spears*, 558 F.2d at 1298. The trial judge crossed that point in this case. To allow Petitioner's conviction to stand, in the face of the trial court's irrefutable errors, would be a dereliction of this Court's duty

to "guard against extreme malfunctions in the state criminal justice systems[.]" *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia,* 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)).

As Petitioner's brief undeniably established, this is not the first time Judge Wogan exceeded his powers to the detriment of a criminal defendant. Pet'r's Supp. Br. 21, ECF No. 24. In *Commonwealth v. McNeal*, the Superior Court censured Judge Wogan for his "unapologetic admission that he considered evidence *dehors* the record when deliberating upon and rendering a verdict." 120 A.3d 313, 328 (2015). There, Judge Wogan convicted the defendant of criminal mischief based on evidence contained in a letter that the Commonwealth never introduced at trial, "notwithstanding an apparent glimmer of recognition that it was improper for him to do so." *Id*. Judge Wogan attempted to shift the blame onto defense counsel for supposedly allowing his client to send him the letter, but the Superior Court confirmed it was Judge Wogan who had made a "stark and fundamental error" in relying on the correspondence. *Id*. <u>The court vacated the conviction.</u> Likewise, in *Commonwealth v. Williams*, the Superior Court chastised Judge Wogan for an "accumulation of inappropriate remarks" that evidenced "partiality, prejudice, bias or ill will" at sentencing. 69 A.3d 735, 744 (2013). In that case, Judge Wogan struck "a tone of advocacy rather than dispassionate reflection" when expressing his views as to the defendant's gender, mental health and religious "animus." *Id*. at 744-49. The Superior Court concluded "the overwhelming appearance of bias on the part of the trial court rendered Appellant's sentence an abuse of discretion." *Id*. at 749. <u>The court remanded for resentencing.</u>

Those same concerns are not entirely absent from this case. Judge Wogan had the opportunity to correct his error, but declined to do so. Instead of acknowledging his mistake, Judge Wogan mischaracterized his erroneous instruction as a mere "correction" of defense

counsel's "misstatement" even though counsel had accurately represented the facts as they appeared in the record and it was Judge Wogan who had injected irrelevant and unfairly prejudicial evidence into the case. Such oblivious disregard for the facts also infected sentencing through the imposition of the weapon enhancement without proper justification. In sum, his conduct skirted the edges of impartiality. Justice John M. Harlan II once noted, with respect to the doctrine of *per se* reversible errors, "[C]ertain types of official misbehavior require reversal simply because society cannot tolerate giving final effect to a judgment tainted with such intentional misconduct." *Chapman v. California*, 386 U.S. 18, 52 n.7 (1967) (Harlan II, J., dissenting). His words ring true today.[5]

## CONCLUSION

For the foregoing reasons, this Court grants the writ of *habeas corpus* and orders the Commonwealth to release Petitioner unless the state court holds a new trial within the next six months in a manner not inconsistent with this Memorandum. An appropriate order follows.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. Darnell Jones, II    J.

---

[5] Because this Court is satisfied that the proper remedy in this case is a new trial or Petitioner's release, it is unnecessary to address the separate sentencing claim any further. This decision notwithstanding, this Court continues to hold the view that the Superior Court's *ex post* justification for the weapon enhancement "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. § 2254(d), as determined in this Court's September 30, 2016 Opinion. ECF No. 16. Even if the sentencing claim were procedurally defaulted, this Court would nonetheless remand for resentencing because to do otherwise would "result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).